IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 25, 2022 Session

## STATE OF TENNESSEE v. JUSTIN ANTONIO McDOWELL

**Appeal from the Criminal Court for Knox County**
**No. 115569   Steven W. Sword, Judge**

_____

### No. E2020-01641-CCA-R3-CD

_____

The Defendant, Justin Antonio McDowell, was convicted by a Knox County Criminal Court jury of two counts of possession of more than 0.5 gram of cocaine with the intent to sell or deliver within a drug-free zone, a Class A felony; possession of more than twenty-six grams of methamphetamine with the intent to sell, deliver, or manufacture within a drug-free zone, a Class A felony; unlawful possession of a firearm by a person previously convicted of a violent felony, a Class B felony; and two counts of unlawful possession of a firearm with the intent to go armed during the commission of a dangerous felony, a Class D felony. *See* T.C.A. §§ 39-17-417(a), (c), (i) (possession of cocaine or methamphetamine) (2018) (subsequently amended); 39-17-1307(b)(1) (possession of a firearm after previously having been convicted of a violent felony); 39-17-1324(a) (possession of a firearm with the intent to go armed during the commission of a dangerous felony) (2018) (subsequently amended); 37-17-1324(g)(2) (increasing the penalty for unlawful possession of a firearm with the intent to go armed during the commission of a dangerous felony, if the defendant had a prior felony conviction at the time of the present offense). The trial court merged two of the firearm convictions and imposed an effective thirty-year sentence, to be served at 100%. On appeal, the Defendant contends that: (1) the evidence is insufficient to support his convictions, (2) the trial court erred in denying his motion to suppress evidence obtained after his unlawful detention and a warrantless search of his car and motel room, (3) the trial court erred in admitting drug evidence because an unbroken chain of custody was not established, and (4) he is entitled to a sentence reduction due to post-sentencing changes to the drug-free zone sentence enhancement statute. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Chelsea C. Moore, Knoxville, Tennessee, for the Appellant, Justin Antonio McDowell.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Charme P. Allen, District Attorney General; Phillip Morton and Ta Kisha Fitzgerald, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions resulted from events which occurred after police responded to a report of a man with a gun threatening another person in a motel parking lot. After officers arrived, they detained the Defendant and searched a car and the Defendant's motel room. Drugs, cash, and firearms were found during the searches.

### Suppression Hearing

The Defendant filed two pretrial motions to suppress the evidence obtained after he was detained by officers and a car and his motel room were searched. The first motion alleged that the officers detained the Defendant without a warrant and without reasonable suspicion or probable cause and that the evidence obtained during the warrantless search of a car must be suppressed. The second motion alleged that the Defendant's motel room was searched without a warrant and without his consent and that the evidence obtained must be suppressed.

At the suppression hearing, the State argued that the Defendant lacked standing to challenge the searches of the car and the motel room. The Defendant testified relative to the question of standing that the car, a gold Impala, belonged to his girlfriend, Takale Andrews. He said that she had been at the motel on the night of January 24, 2019, but that she had been at her grandmother's house when the police were present. He acknowledged that he did not have "primary possession" of the car that night but said he had a key to the car in the motel room he had rented with Ms. Andrews. He agreed that he was a "frequent rider" in the car, that he had a key to the motel room, and that he "spent the night" in the room. He said that he and Ms. Andrews had stayed at the motel for about one month, that he rented the room in his name, and that he paid for the room weekly. He said Ms. Andrews had "probably some clothes or something" in the room when the police searched it. He said he had clothing and shoes in the room when the police searched it. He agreed that he and Ms. Andrews were the only people who stayed in or had access to the room. He thought they both had keys to the room.

The Defendant testified that he had driven the car a couple of days before January 24, 2019. He later said he had driven the car on the morning of January 24. He said that the "car was on flats" on January 24, that Ms. Andrews had "flat" the tires, and that the tires were not flat when the police officers were present. He said that when the officers

-2-

asked for permission to search the car, he did not give them permission and that he told them, "[T]he car is not mine for you to search."

The trial court stated that it "tentatively" found the Defendant had standing to challenge the search of the car. The court found that the Defendant had standing to challenge the search of the motel room. Thus, the court allowed the hearing to proceed.

Knoxville Police Department (KPD) Officer Dylan Williams testified that he was on patrol on January 24, 2019, when he received a report that a black man had retrieved a handgun from a gold Chevrolet Impala, waved it in the air, and threatened someone. Officer Williams said that when he arrived at the motel, he saw an unoccupied gold Impala and parked next to it. He said a motel employee approached him, pointed to the Defendant, who stood on a second-floor balcony, and "indicated that's the guy that he had called on." Officer Williams agreed that the employee had said he did not see a gun but that the employee said he heard someone threaten to get a gun, and that the employee said the Defendant "had reached and [waved] something around."

Officer Williams testified that he asked the Defendant to come downstairs to speak to him and that the Defendant complied. Officer Williams said he patted down the Defendant to ensure the Defendant did not have weapons. Officer Williams said, "I was trying to ask [the Defendant] about what happened and . . . the circumstances why someone would say that he was [waving] a gun around and if there had been an argument or anything." Officer Williams said the Defendant stated that "his girlfriend or ex-girlfriend had attempted to slash the tires, and that's what the fights throughout the day were about."

Officer Williams testified that he asked for consent to search the car. Officer Williams said the Defendant said "yes" and "didn't protest at all when Officer Williams opened the driver's door. Officer Williams said he saw a "corner baggie of what appeared to be crack cocaine" in the door pocket. Officer Williams said he had wanted to search the car for a weapon and acknowledged that no gun was found in the car. Officer Williams said he and other officers took the Defendant into custody after Officer Williams found the suspected crack cocaine. Officer Williams said that the Defendant, who had been sitting on a sidewalk, tried to stand and pull his arms away and that the officers had to push the Defendant onto a car in order to place him in handcuffs.

Officer Williams testified that the motel maintenance employee told him the Defendant and a woman had been involved in two incidents on January 24, 2019. Officer Williams said the man stated that an earlier incident had involved a knife "when she was trying to slash the tires" and that the tire slashing incident had been separate from the later events which caused the man to call the police. Officer Williams said the employee stated that the motel's management wanted the Defendant's room "cleared out" due to danger to employees and guests from the Defendant's and the woman's presence. Officer Williams

said that other officers went with the employee "to change . . . the room key so no one could access" the room.

Officer Williams testified that his police car was equipped with recording equipment and that he had recording equipment attached to his uniform. He agreed that KPD policy required an officer to activate the recording equipment when "interacting with the public." The recording from his in-car equipment was played for the trial court. The recording captured the sound of interactions between the Defendant and Officer Williams shortly after Officer Williams' arrival, but their images are not captured in the camera's view. Officer Williams can be heard asking a person to come talk to him, although the people are not shown on the video. Officer Williams can also be heard talking to a person who we infer was the motel employee who called 9-1-1. The person reported that he saw the Defendant standing by a car, heard the Defendant say he had a gun, and saw the Defendant go to a car and bring a gun out of the car. Officer Williams asked if a weapon or "anything we need to worry about" was in the car, and a voice we infer was the Defendant's said, "Nah." Officer Williams asked, "Do you mind if we check real quick?" The Defendant responded, "Nah." Arguing or yelling occurred and lasted several seconds. An officer asked "Kenny" to go with "him" to a motel room and stated, "We really want to find that gun in there." The time which elapsed from Officer Williams' request for the Defendant to come talk to him upon Officer Williams' arrival and the request to search the car was approximately five minutes. After the Defendant said he did not mind the officers searching the car, the sound of what we infer was the struggle between the Defendant and officers began within about thirty seconds. An officer repeatedly told the Defendant to sit down. Less than two minutes after the Defendant said he did not mind if the officers searched the car, an officer told the Defendant that crack cocaine had been found, and the Defendant protested that the car was not his. The video recording showed a portion of the incident in which officers put the Defendant on the trunk of a patrol car, which occurred less than five minutes after the Defendant said he did not mind if officers searched the car.

Referring to the recording, Officer Williams testified that the Defendant told him that a woman, who was no longer at the scene, had caused the earlier disturbance. Officer Williams agreed that the Defendant said he had asked the woman to leave and that a gun was not mentioned.

Officer Williams testified that a portion of the recording which "seemed to be dead air" might be his having turned off the microphone. He said the only time he purposefully turned off the microphone would have been if he were speaking to another officer, but he did not recall if he had stepped aside to speak to another officer.

Officer Williams identified a crime scene evidence log and said he had not been the officer who completed it. He agreed that no evidence was listed as having been recovered from a gold Chevrolet Impala. He agreed that crack cocaine was listed as having been

recovered from a shoe box in the motel room. He said that he had given the crack cocaine from the car to Investigator Phil Jinks. Officer Williams said that crack cocaine was found in both the car and in a shoe box in the room. He thought that the officer who completed the form thought the crack cocaine, which was listed as two bags of crack cocaine, had been "confiscated as one item." Officer Williams agreed that white powder which appeared to be cocaine found in the motel room had been listed separately. Officer Williams said he had listed the crack cocaine he recovered from the car in the "online Watson system" that was separate from the crime scene evidence log.

Officer Williams acknowledged that he and other officers could be heard on the recording discussing their suspicion that the Defendant had put a gun in the motel room before they arrived. He agreed that the police did not have a legal basis to enter the room at the time of the discussion. He agreed that he told his sergeant that he was aware of the Defendant's prior history of violent felonies, including homicide, and of rumors the Defendant had been involved in an unrelated shooting for which the Defendant had not been charged. Officer Williams said he "assume[d]" he had referred to the Defendant when Officer Williams stated in the recording that the motel management was "kicking him out of his room," that Officer Williams hoped the gun was in the room, and that "[W]e're going to escort him to get his stuff out of the room." He said he might have been referring to the "security guard or the maintenance guy" getting the Defendant's belongings from the room. Officer Williams agreed that he had said to Kenny Harrell, "Hey, will you go with him to secure the room. We're really checking it out. We want to find a gun in there." Officer Williams agreed that the officers decided they would escort the maintenance employee to the room and that he remained downstairs while other officers went to the room with the maintenance employee.

A Property Inventory Report, a Supplement Page for the Property Inventory Report, a copy of a Narcotics Envelope, a Tennessee Bureau of Investigation Crime Laboratory Request for Analysis, a Crime Scene Evidence Log, and an Arrest Report were received as an exhibit.

Ben Wolever, an InTown Suites employee, testified that he was at work on January 24, 2019, and that he was familiar with the Defendant as a motel resident. Mr. Wolever said that around 2:00 p.m. on January 24, he heard a loud disturbance and saw a woman come from a motel room and stab the tires on a gold car in the parking lot. He heard the woman speak but could not understand what she said. He said he heard the Defendant say, "It's not my car. Your tires." Mr. Wolever said that around 8:00 p.m., he heard "very loud talking" from the parking lot. He said he heard the Defendant say, "I've got a gun. I'll show you." Mr. Wolever said that he had not seen to whom the Defendant spoke but that he saw the Defendant walk to the gold car. Mr. Wolever said the Defendant "came out" and walked "across the parking lot with a [black] gun in his hand." Mr. Wolever said he called 9-1-1 because guns were not allowed on the motel property and because he had been

instructed by his manager after the earlier disturbance "to have them removed" if another disturbance occurred. Mr. Wolever said that officers arrived quickly and that he told the officers that he needed the Defendant to be removed from the property. When asked if he told Officer Williams that he had not seen a gun, Mr. Wolever explained that he had said he did not know what type of gun he had seen.

Mr. Wolever identified photographs of the scene and explained where relevant events occurred. The photographs were received as an exhibit.

Mr. Wolever testified that no one else "associated with" the Defendant was in the parking lot and that no one else was in the Defendant's room when Mr. Wolever entered it. Mr. Wolever said that because he had seen the Defendant with a gun and did not know if anyone was in the Defendant's motel room, he asked officers to accompany him into the room.

Mr. Wolever testified that the motel's eviction policy, which was stated in a document signed by guests, provided that the possession of firearms or involvement in physical disturbances was cause for removal. He said securing a room involved the following: He knocked on the door three times and waited for a response; he opened the door with a master key; he ensured that no one was in the room; he locked the windows; he closed the door and used a "cancel key" that prevented the use of other keys to unlock the door. He acknowledged that the cancel key could be used without opening a door. He said that he could determine whether a window was locked from outside a room but that he could not lock a window without entering a room.

Mr. Wolever testified that when he opened the door to the Defendant's motel room, he saw a handgun in "plain sight" on the "dresser underneath the TV." Mr. Wolever said the officers stood at the door and to the left when he saw the gun. Mr. Wolever said officers entered the room to ensure that no one was present and left the room. Mr. Wolever said he entered the room, secured the window, left the room, and used the cancel key. He said that this took less than three minutes, that officers arrived later with a search warrant, and that he allowed them to enter the room to execute the warrant.

KPD Officer Christopher Medina testified that he responded to a call at InTown Suites on January 24, 2019. He said that when he arrived, the Defendant was "in custody," seated on a curb, and in handcuffs. Officer Medina said that after he arrived, Mr. Wolever asked him to go to a guest room "for safety reasons" while Mr. Wolever "began to shut that room down." Officer Medina said Mr. Wolever's objective had been to empty the room of any occupants. Officer Medina said that as Mr. Wolever opened the door, Officer Medina saw a black handgun on a table "in plain view" in the room. Officer Medina said that he was outside the room when he saw the gun and that once he saw the gun, he and another officer entered the room to conduct a "safety sweep to make sure there was no one

else in there that may have been armed." Officer Medina said that he and the other officer did not touch anything, that they secured the room, and that they called Investigator Jinks. Officer Medina said the police did not ask Mr. Wolever to open the Defendant's room door in order for the police to "look around." Referring to a video recording, Officer Medina identified relevant events in the entry of the Defendant's room. Officer Medina thought that Officer Nations was the person who said, "What do you have on him?" before they entered the room and that Officer Williams was the person who responded, "Crack right now." Officer Medina thought crack cocaine had been found in the car.

The defense offered an affidavit of James Berry, which was received as an exhibit. In the affidavit, Mr. Berry stated that he knew the Defendant and that he had been at InTown Suites on January 24, 2019. Mr. Berry said he had witnessed an altercation between the Defendant and a woman that night and that he never saw the Defendant with a gun. Mr. Berry stated that after the woman left the parking lot, he stood outside with the Defendant until the police arrived, and that the police never tried to speak to him before they restrained the Defendant in handcuffs.

After receiving the evidence, the trial court credited Officer Williams' testimony. The court found that Officer Williams received a report of a potential disturbance involving a person with a gun, that Mr. Wolever told Officer Williams he had seen the Defendant with a gun, and that Mr. Wolever called the police because he had seen a gun and wanted assistance because he knew he was "getting ready to kick these folks out." The court found that Officer Williams asked the Defendant to "step down" to talk to him, that the Defendant said the altercation was over and that the woman who had been involved in the altercation was gone, and that the Defendant "indicate[d] . . . some knowledge of" the gold Impala. The court found that when Officer Williams asked if anything was in the car, the Defendant said there was not, that Officer Williams asked if he could search the car, and that the Defendant stated his consent. The court found that Officer Williams opened the car's door and immediately found what appeared to be crack cocaine. The court found that the Defendant was cooperative with the police and that the Defendant "[i]ndicated he had nothing to hide and that the problem was all with a woman," which the court found was consistent with the Defendant's providing consent to Officer Williams to look inside the car. Thus, the court concluded that the car search was lawfully conducted with the Defendant's consent.

Regarding the room search, the trial court found that the Defendant had a privacy interest in his motel room but that Mr. Wolever was not an agent of the State. The court found that the officers did not ask Mr. Wolever to open the room for them and that Mr. Wolever asked the officers to accompany him to the room for his safety. The court found that although the officers wanted to know what was in the room, they had a right to be on the balcony outside the room's door and that the Defendant had no reasonable expectation of privacy in the balcony. The court credited the testimony of Officer Medina and Mr.

Wolever that they saw the gun in plain view when Mr. Wolever opened the door. The court found that the officers ensured that no one was in the room before the room was secured and that they obtained a search warrant. Thus, the court found that no constitutional violation had been shown, and it denied the motion to suppress the evidence seized from the motel room.

The Defendant later filed a motion to reconsider the suppression issues, which the trial court denied on the basis that it raised new issues which had not been raised in the original motions and because it was untimely. In a written order, the court found that although presented as a motion to reconsider, the motion was, in fact, a new motion to suppress because it raised new theories for suppression of evidence, that it was filed the day before the trial, and that it was untimely pursuant to Tennessee Rules of Criminal Procedure 12(b)(2). The order denying the motion to reconsider also stated that the court had ruled from the bench at the suppression hearing in order to provide an expeditious ruling to the parties, due to the upcoming trial date. The court stated in the order that it had made the following findings in its previous denial of the motion to suppress: The State's witnesses who testified at the suppression hearing had been credible. The Defendant had been detained briefly and upon reasonable suspicion in conjunction with an investigation of a person with a weapon. The Defendant provided consent to search the gold Impala, and officers quickly developed probable cause that the Defendant possessed a controlled substance. The motel room was opened by a motel employee "on his own actions" and not at the direction of law enforcement, the latter of whom were gathered legally outside the room to ensure the safety of the motel employee. From the public walkway outside the room, the officers saw a gun in plain view in the room. The search of the room was limited, at this point, to ensuring that no one was inside, and a search warrant was obtained.

## Trial

InTown Suites employee and resident Ben Wolever testified that he knew the Defendant as a former motel guest. He thought the Defendant had lived at the motel for about two months and did not know whether anyone lived with the Defendant at the time.

Mr. Wolever testified that around 2:00 p.m. on January 24, 2019, the Defendant and a woman had a "debate," during which the Defendant "was upstairs [near his room] and she was cutting tires" on a gold Impala. Mr. Wolever said that later that evening as he went from the third floor to the second floor and walked on a second-floor breezeway, he heard an argument and saw the Defendant next to a car. Mr. Wolever said he heard the Defendant say, "I've got a gun," and walk toward the Impala. Mr. Wolever said he saw the Defendant come out of the Impala while holding a black handgun. Mr. Wolever said the Defendant walked toward another car "where he was having a debate with . . . whoever was driving the car." Mr. Wolever said he called 9-1-1 to report that he had heard an argument and had seen a gun. Mr. Wolever said motel policy prohibited guns from the

property.  Mr. Wolever said that after the first disturbance in which the Defendant had been involved, the general manager instructed Mr. Wolever to have the Defendant removed from the property if another disturbance occurred.

Mr. Wolever testified that when an officer arrived, he approached the officer, identified the gold Impala from which he had seen the Defendant emerge with a gun, and told the officer he had seen the Defendant drive onto the motel property with another person in the car around 7:00 p.m.  Mr. Wolever denied that he told the officer he had not seen a gun.  Mr. Wolever said that because he "had seen another individual," he asked an officer to go to the Defendant's motel room while Mr. Wolever secured it.

Mr. Wolever testified that he opened the Defendant's motel room and that he saw a gun on a dresser in "clear and plain sight of the door."  He said two officers stood at his left and that the officers entered the room to check if anyone was inside.  Mr. Wolever said he checked to ensure that the windows were locked, used the cancel key, and closed the door.

Mr. Wolever did not recall if he passed any hotel guests on the second-floor breezeway on the night he saw the Defendant in the parking lot and called 9-1-1.  He did not recall having testified previously that he passed the occupant of room 209, but he agreed that the person who occupied room 209 at the time was a smoker who was outside the room frequently.

KPD Officer Dylan Williams testified that on January 24, 2019, he was dispatched to InTown Suites regarding a report that a man was "waving a gun around, making threats."  Officer Williams said that when he arrived, he spoke to Mr. Wolever, who pointed out the Defendant on a second-floor balcony.  Officer Williams said Mr. Wolever told him that he had not seen a gun.  Officer Williams did not recall if another man was also on the balcony.  Officer Williams said that he asked the Defendant to come downstairs to speak to him and that the Defendant complied.

Officer Williams testified that he told the Defendant about the report of a disturbance involving threats, that the Defendant said a woman he identified as "the mother of his child or ex-girlfriend . . . was making a scene," and that the woman had slashed or attempted to slash the tires of a gold Impala.  Officer Williams said the Defendant stated the woman was no longer "on the scene."  Officer Williams said he patted down the Defendant to ensure that the Defendant did not have any weapons.  Officer Williams agreed that the Defendant was cooperative, seemed "[s]omewhat" nervous, and did not mention or admit having a firearm.

Officer Williams testified that, based upon the information that the Defendant had retrieved a gun from the Impala, he believed "a good likelihood" existed that a gun was in

the Impala. Officer Williams said that he asked for permission to search the Impala and that the Defendant said he "didn't care." Officer Williams said the Defendant stated that the car belonged to the woman who had tried to slash the tires. Officer Williams said another officer asked the Defendant to "stay seated" when the Defendant tried to follow Officer Williams to the Impala. Officer Williams said that when he opened the driver's door, he saw a bag containing what appeared to be crack cocaine in the driver's door pocket. He described the bag containing the substance as "a corner baggie that had been ripped off," which he said was consistent with how drugs were packaged for resale. He said no drug paraphernalia was found inside the car. He said he told another officer that they needed to take the Defendant into custody. Officer Williams said that as other officers tried to get the Defendant to put his hands behind his back, the Defendant tried to stand up and refused to put his hands behind his back. Officer Williams said the officers had to push the Defendant against a car and struggled in order to place him in handcuffs.

Officer Williams testified that he retrieved a drug evidence envelope from his car and placed the suspected crack cocaine from the Impala in it. He said that he put the envelope containing the suspected crack cocaine in the trunk of his car and that he later gave it to Investigator Phil Jinks.

Officer Williams testified that he learned during the investigation that Takale Andrews was "named on the hotel receipt" and that she owned the Impala.

KPD Officer Christopher Medina testified that he responded to a report of a disturbance at InTown Suites on January 24, 2019. He said that he and another officer escorted "the complainant" to a second-floor motel room due to "complaints about violence and weapons there." Officer Medina said the complainant "wanted to . . . secure the room and kick them out." Officer Medina said that when the complainant opened the door, Officer Medina saw a gun on an end table across from the door. He said he stepped inside for a "safety sweep" to ensure that no one was inside, stepped out, and secured the room.

KPD Investigator Phillip Jinks testified that he responded to InTown Suites on January 24, 2019. He said that after speaking with other officers, he had the officers remain at the scene to keep the room secure while he obtained a search warrant for the Defendant's motel room. He said he and other officers searched the room. He identified the search warrant, which was received as an exhibit. He identified photographs taken at the scene, including photographs of the Impala and the motel room's interior, and the photographs were received as exhibits. Referring to a photograph, he identified the location in the room where the gun was found. He identified the gun as a Glock semi-automatic handgun and said the gun had been loaded. He said that during the search, the officers found a baggie of a substance which appeared to be a small amount of marijuana next to the gun. He said the officers found a razor blade with a white, powdery, chalky residue on its cutting edge, which he said "was consistent with being used to cut crack cocaine for distribution." He

said no drug paraphernalia which might indicate drug usage was found in the room. He said drug users typically possessed items such as a pipe or hypodermic syringes for using drugs. He acknowledged that cigar wrappers were found in the room and that scales were not found. He identified a plastic bag with white, powdery residue but did not recall if it was collected. He identified a photograph of a "rather large baggie of methamphetamine," which he said was found in a drawer near the gun and the Defendant's Tennessee identification card, and he said the methamphetamine weighed approximately one ounce. He said that a methamphetamine user typically possessed one-sixteenth of one ounce and that the larger quantity discovered in the motel room would be an amount characteristic of methamphetamine distribution. He said that a shoe box containing about $2800 in cash was found on a closet shelf and that drug distributors typically had large amounts of cash, whereas drug users did not. He said the shoe box also contained two "corner baggies," one of which contained about twelve grams of crack cocaine, and the other of which contained a small amount of methamphetamine. He said the crack cocaine was in a "cookie" shape, which was typical of the shape of cooked crack cocaine before it was cut into smaller pieces with a razor blade. He said an FN 9-millimeter handgun, which he did not think contained ammunition, was found on a closet shelf. He said that a "large wad of sandwich bags" was found in a dresser drawer and that a key which opened the Impala was found on top of the dresser. He agreed that women's clothing was stored in the room.

Investigator Jinks identified a Room Agreement for InTown Suites room 210, which he said was found in the room and which listed the Defendant and Takale Andrews as the room's occupants. He acknowledged that he did not check Ms. Andrews' criminal history to determine if she was able to possess firearms legally. He said that a handwritten note was found in the room and that it said, "Mac, holler at me when you can, Jim, Room 209." Investigator Jinks testified that he did not speak to the occupant of room 209. He said that the officers found a cell phone box in the room and that drug distributors frequently obtained new cell phones. He identified photographs showing field testing and weighing of the suspected drugs found in the room, and the photographs were received as exhibits.

Investigator Jinks testified that he followed KPD protocol, which required for suspected controlled substances to be packaged in plastic and placed inside a paper drug envelope. He said that for the two bags of suspected crack cocaine recovered from the car and the motel room in the present case, he placed each baggie containing the substances in their own second plastic bag, labeled the two exterior plastic bags with "car" and "room" to identify the respective locations where they were found, and placed them in a single drug envelope. He said he labeled the outside of the drug envelope with identifying information specific to the case. He said the drug envelope was sealed with evidence tape which would show evidence of opening if tampering occurred. He said that KPD transported the sealed evidence to the Tennessee Bureau of Investigation (TBI) and picked it up after TBI completed its testing. He said that after testing, TBI resealed the evidence with evidence tape and applied identifying markings. Investigator Jinks identified the drug evidence

-11-

collected in the present case and said it had remained sealed from the time it was tested by TBI, aside from his having opened it earlier that morning in preparation for his testimony and resealing it, until he opened it during his testimony. Investigator Jinks said he created a single Property Inventory Report which listed the items recovered from the searches of the car and motel room. He said that no separate report was created for the car and that a single report was used because the items were all recovered from the same criminal incident and that the individual items were labeled with the location where they were found.

Investigator Jinks testified that, based upon his twenty years of law enforcement experience, he believed the substance found in a bag near the gun was marijuana, although it was not tested due to TBI policy. He acknowledged that marijuana and hemp, the latter of which could be possessed legally in Tennessee, were similar in appearance and smell. He thought the suspected crack cocaine from the car was not tested due to TBI policy not to test "visually consistent substances." He said the suspected crack cocaine from the car was visually consistent with the crack cocaine from the room, the latter of which was tested by the TBI. In his opinion, the suspected crack cocaine from the car was cut from the larger piece of crack cocaine from the room and was intended for "redistribution," which might involve its being provided to another drug dealer for sale to individual users. He acknowledged that he did not field test the suspected marijuana from the room or the suspected crack cocaine from the car. The substances which had been collected and packaged in the drug envelope were received as an exhibit.

Investigator Jinks testified that in his opinion, based upon the quantity of drugs, the packaging, the razor blade, the cash, the lack of drug paraphernalia, and the firearms recovered during the searches, the Defendant possessed the drugs with the intent to distribute them. He said that Bearden High School was within 1000′ of InTown Suites.

TBI Crime Laboratory Special Agent Forensic Scientist Noah Hamlett, an expert in forensic chemistry, testified that he received a sealed envelope containing evidence related to this case, which he identified. He said that upon its receipt by a TBI evidence technician, the envelope was stored in the evidence vault until it was assigned to him for analysis. Based upon his forensic analysis, he identified the following substances: (1) a yellow, rock-like substance that was 9.89 grams of cocaine base and was labeled "room," (2) a crystalline substance that was 2.53 grams of methamphetamine, and (3) a substance that was 27.67 grams of methamphetamine. He said that the three substances he tested were classified as Scheduled II controlled substances. He said he also received a second yellow, rock-like substance which, inclusive of its packaging, weighed 1.83 grams and was labeled "car." He did not test this substance because of its similarity to the substance he identified as 9.89 grams of cocaine base and because cumulative weight of the two substances would not exceed the next statutory weight threshold for the grading of offenses. He said, however, that both substances were visually consistent in color and texture. He said he received a bag containing plant material, which he did not test. He agreed that CBD in

plant form appeared and smelled the same as marijuana. He said the submittal form contained the address where the evidence was found but did not contain specific location information for each item. He said the items labeled "car" and "room" contained these notations on their inner plastic bags.

KUB Geographic Information Systems (KGIS) employee Donna Roach testified that she prepared a map designating the 1000′ buffer around Bearden High School. The map was received as an exhibit. She said the entire property comprising InTown Suites was within 1000′ of Bearden High School property.

Knox County Schools Security Division employee Martin Timms testified that Bearden High School was a functioning school on January 24, 2019.

The parties stipulated that the Defendant had a September 17, 2009 conviction for a felony which prohibited him from possessing a firearm.

After receiving the evidence, the jury found the Defendant guilty of two counts of possession of more than 0.5 gram of cocaine with the intent to sell or deliver within a drug-free zone, possession of more than twenty-six grams of methamphetamine with the intent to sell or deliver within a drug-free zone, possessing a firearm after having been convicted of a felony, and possessing a firearm during the commission of a dangerous felony. The jury acquitted the Defendant of misdemeanor possession of marijuana.

In a bifurcated proceeding, the jury considered additional evidence regarding the firearm counts. A Knox Count Criminal Court clerk identified certified judgments of convictions, which were received as exhibits. The documents reflected the Defendant's prior convictions for (1) aggravated assault, imposed on April 3, 2008, and (2) voluntary manslaughter, imposed on September 17, 2009.

After receiving the evidence in the second phase of the trial, the jury found the Defendant guilty of unlawful possession of a firearm after having been convicted previously of a violent felony offense and of unlawful possession of a firearm with the intent to go armed during a dangerous felony, with a prior felony conviction.

The trial court merged the convictions for unlawful possession of a firearm with the intent to go armed during a dangerous felony and for unlawful possession of a firearm with the intent to go armed during a dangerous felony, with a prior felony conviction. After receiving proof at a sentencing hearing, the trial court imposed an effective thirty-year sentence. This appeal followed.

-13-

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions. In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Circumstantial evidence alone may be sufficient to establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The identity of the perpetrator is a question of fact for the jury to determine. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'" *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

### A. Drug Convictions

The Defendant was convicted of two counts of possession of more than 0.5 gram of cocaine with the intent to sell or deliver within a drug-free zone and possession of more than twenty-six grams of methamphetamine with the intent to sell or deliver within a drug-free zone.

It is an offense for a defendant to knowingly:

(1) Manufacture a controlled substance;

(2) Deliver a controlled substance;

(3) Sell a controlled substance; or

(4) Possess a controlled substance with intent to manufacture, deliver or sell the controlled substance.

T.C.A. § 39-17-417(a) (2018) (subsequently amended).  At the time of the offenses,

> A violation of § 39-17-417, or a conspiracy to violate the section, that occurs on the grounds or facilities of any school or within one thousand feet (1000′) of the real property that comprises a public or private elementary school, middle school, [or] secondary school . . . shall be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) for such violation.

*Id.* § 39-17-432(b)(1) (2018) (subsequently amended).

In Count 1, the Defendant was convicted of possession of cocaine with the intent to sell or deliver for the cocaine found in a box inside the motel room closet.  The Defendant argues that the State failed to show that he possessed the cocaine.  He notes the presence of women's clothing in the room, the evidence he shared the room with a woman, and the evidence a woman became so enraged with him earlier in the day that she slashed the tires on her car.  The Defendant posits that the woman might have been "desperate to punish" him.

This court has said that possession of an illegal drug may be actual or constructive. *State v. Bigsby*, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000).  In order to establish constructive possession, "it must appear that the person has the power and intention at any given time to exercise dominion and control over the drugs either directly or through others." *Id.*

Viewed in the light most favorable to the State, the evidence shows that a substance containing yellow, rock-like substance was found in a shoebox on a closet shelf of the Defendant's motel room.  Forensic testing later confirmed that the substance was cocaine base and that it weighed 9.89 grams.  The cocaine was in a "cookie" shape, which was typical of crack cocaine that had not yet been cut into smaller pieces for "redistribution." A razor blade and plastic bags were found elsewhere in the room, and the evidence showed that both items were commonly used by dealers to cut and package drugs.   The shoebox also contained about $2800, and a gun was also found in the closet.  A second gun and

additional drugs were found elsewhere in the room. Although the Defendant argues that a woman also occupied the room with the Defendant and that the Defendant had been involved in an earlier altercation with a woman, the evidence shows that the Defendant rented the room, that a woman left after arguing with the Defendant, that the drugs remained at the motel with him, and that the Defendant was standing outside the room when the officers arrived. From this evidence, a rational jury could find beyond a reasonable doubt that the Defendant was in actual or constructive possession of the drugs. *See State v. Ross*, 49 S.W.3d 833, 845-46 (Tenn. 2001) (holding that the evidence was sufficient to show the defendant possessed drugs in a hotel room where the room was registered in his name, he paid for the room, he possessed a room key, and items containing his name were found in the room). This court may not invade the province of the jury by reweighing the evidence. *See Bland*, 958 S.W.2d at 659. The evidence is sufficient to support the Defendant's conviction in Count 1.

The Defendant was convicted in Count 2 of possession of cocaine with the intent to sell, deliver, or manufacture the cocaine found in the driver's door pocket of the gold Impala. The Defendant argues that the State failed to present evidence of laboratory testing regarding the identity of the substance and of the net weight of the substance inside the baggie. He also argues that the substance was found in another person's car and that no evidence showed who placed the item in the car and when the item was placed there.

Viewed in the light most favorable to the State, the evidence shows that 1.83 grams of a yellow rock-like substance was found in the driver's door pocket of the gold Impala. Although the substance was not tested by the TBI Laboratory, both Investigator Jinks and Agent Hamlett testified that it was visually consistent with the larger rock-like substance, the latter of which was tested and confirmed to be cocaine base. In addition, Investigator Jinks testified that the substance's packaging was consistent with packaging commonly used for drugs. He said the smaller rock from the car "matche[d] up" with the larger piece of confirmed crack cocaine. Although the Defendant told Officer Williams that the car belonged to a woman who was not present, the Defendant claimed knowledge of its contents to the extent that he responded, "Nah," when Officer William asked if they would find a weapon or "anything we need to worry about" in the car, and the Defendant exercised control over the car by permitting the officers to search it, even after he had identified another person as its legal owner. Mr. Wolever had seen the Defendant retrieve a gun from the car. Guns and cash were found in the Defendant's motel room. A "cookie" shaped piece of crack cocaine was found in the room, which the evidence showed corresponded with the shape of the smaller piece found in the car. The Defendant's identification card and a key to the car were also found in the motel room.

This court has held that a police officer's testimony regarding the identity of a substance as an illegal drug may be sufficient to support a conviction related to the use or possession of a drug. *See State v. White*, 269 S.W.3d 903, 907 (Tenn. 2008). This is

particularly the case if the testimony is corroborated by additional circumstantial evidence that a substance is an illegal drug. *See id.* The evidence is sufficient to show that the Defendant possessed the cocaine base in the car with the intent to sell or deliver.

In Count 3, the Defendant was convicted of possession with the intent to sell or deliver more than twenty-six grams of methamphetamine. Again, the Defendant argues that the State failed to prove that he possessed the drugs, noting that he occupied the motel room with a woman and positing that the woman with whom he argued earlier might have wanted to punish him.

Viewed in the light most favorable to the State, the evidence shows that the police discovered a large bag of methamphetamine in a drawer, near a firearm and the Defendant's identification card. Forensic testing showed that the substance weighed 27.67 grams and was methamphetamine. Investigator Jinks testified that the amount was larger than the small amount typically possessed by methamphetamine users. Firearms, plastic bags, other drugs, and a large amount of cash were discovered in the room. As noted previously, the woman who was authorized to occupy the room with the Defendant had left, and the drugs remained with the Defendant. The jury credited the State's witnesses and evidence, and we may not reweigh the evidence. The evidence is sufficient to support the Defendant's convictions.

The Defendant has not challenged the jury's findings that the three drug offenses were committed in a drug-free zone. In any event, the record supports the jury's determinations in this regard.

### B. Firearms Offenses

The Defendant was convicted of three firearms offenses. He argues that the State failed to prove he possessed the guns that were recovered from his motel room.

In Count 4, the Defendant was convicted of unlawful possession of a firearm after having been convicted previously of a violent felony offense. "A person commits an offense who possesses a firearm, as defined in § 39-11-106, and . . . [h]as been convicted of a felony crime of violence[.]" T.C.A. § 39-17-1307(b)(1) (2018).

Viewed in the light most favorable to the State, the evidence shows that the police found two handguns in the Defendant's motel room. One of the guns was in plain view near the door when Mr. Wolever opened the door to secure the room after the Defendant's arrest. The gun was near the Defendant's Tennessee identification card. The Defendant was standing outside the room, which was rented in his name, when Officer Williams arrived at the scene. Mr. Wolever testified that he saw the Defendant come out of the gold Impala and wave a black handgun earlier that evening, which prompted Mr. Wolever to

-17-

call 9-1-1. The parties stipulated that the Defendant had a prior conviction for a felony which prohibited him from possessing a firearm. The State presented evidence that the Defendant had prior convictions for aggravated assault and voluntary manslaughter. The evidence is sufficient to support the conviction.

In Count 5, the Defendant was convicted the following offense: "It is an offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony. *Id.* § 39-17-1324(a) (2018) (subsequently amended). As relevant here, "'Dangerous felony' means . . . [a] felony involving the sale, manufacture, distribution or possession with intent to sell, manufacture or distribute a controlled substance or controlled substance analogue defined in part 4 of this chapter[.]" *Id.* at (i)(1)(L).

Viewed in the light most favorable to the State, the Defendant possessed firearms while he possessed cocaine and methamphetamine with the intent to sell or deliver them. His intent to go armed is demonstrated by his stating he had a gun, his retrieving a gun from the Impala, and his waving it during an argument. The evidence is sufficient to support his conviction.

In Count 8, the Defendant was convicted of unlawful possession of a firearm with the intent to go armed during the commission of a dangerous felony, while he had a prior felony conviction. The offense is identical to the offense in Count 5, except that the statutory mandatory minimum sentence increases from three years to five years if the trier of fact finds in a bifurcated proceeding that the "defendant, at the time of the offense, had a prior felony conviction." *Id.* at (g)(2).

Viewed in the light most favorable to the State, the Defendant was guilty of unlawful possession of the firearm with the intent to go armed during the commission of a dangerous felony, as we have explained in our analysis of Count 5. The State presented evidence, as well, that the Defendant had prior convictions for aggravated assault and voluntary manslaughter. The evidence is sufficient to support the conviction in Count 8.

## II

### Denial of Motions to Suppress

The Defendant contends that the trial court erred in denying his motions to suppress evidence obtained from the warrantless search of the Impala and the search of his motel room. He argues that his initial encounter with Officer Williams was an illegal detention and that the subsequent searches of the car and the motel room were further illegalities, the evidence of which must be suppressed. The State counters that no constitutional violations occurred. We agree with the State.

-18-

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

## A. Investigatory Detention

The Defendant argues that he was unlawfully seized and detained when Officer Williams asked him to come downstairs to talk. The State responds that Officer Williams' brief, investigatory detention was justified because it was based upon reasonable suspicion that the Defendant had threatened someone with a gun. The Defendant counters that the detention exceeded the scope permitted for a brief, investigatory stop. We agree with the State.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. Warrantless seizures are "presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the . . . seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997); *see Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). Within the context of warrantless searches and seizures, the courts have recognized certain exceptions to the warrant requirement. *See, e.g.*, *State v. Meeks*, 262 S.W.3d 710, 722 (Tenn. 2008) (listing some of the commonly recognized exceptions to the warrant requirement). The State has the burden to demonstrate that a warrantless search falls within an exception to the warrant requirement. *Id.*

Three levels of police-citizen interactions exist: (1) a full-scale arrest, which requires probable cause, (2) a brief investigatory detention, which requires reasonable suspicion of wrongdoing, and (3) a brief police-citizen encounter, which does not require

objective justification. *State v. Day*, 263 S.W.3d 891, 901 (Tenn. 2008). Only the first two categories constitute a "seizure" for purposes of the Constitution. *Id.*

The Defendant argues, and the State agrees, that the initial encounter in the present case was an investigatory detention, which must be based upon reasonable suspicion. "Reasonable suspicion is a particularized . . . basis for suspecting the subject of a stop of criminal activity, and it is determined by considering the totality of the circumstances[.]" *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000) (internal citations omitted). This determination includes considerations relative to "'(i) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied in light of his knowledge and experience.'" *State v. Pulley*, 863 S.W.2d 29, 34 (Tenn. 1993) (quoting *United States v. Mendenhall*, 446 U.S. 544, 561 (1980) (Powell, J., concurring)). The objective facts upon which the officer relied include, but are not limited to, the officer's observations, information received from fellow officers, information received from citizens, and the "pattern of operation of certain offenders." *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992).

In the present case, Officer Williams responded to a complaint of a dispute involving an armed person. When Officer Williams arrived, he spoke with Mr. Wolever, who stated that he had witnessed the Defendant arguing with a person in a car and that he heard the Defendant claim to have a gun. Officer Williams thought Mr. Wolever stated he had not seen the gun, but Mr. Wolever testified that he told Officer Williams he saw the Defendant go to the gold Impala and retrieve a gun but that he could not describe the gun in detail. The trial court did not resolve this factual disparity, but our review of the recording reflects that Mr. Wolever told Officer Williams that he saw the gun. *See State v. Echols*, 382 S.W.3d 266, 177 (Tenn. 2012) ("The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence."). Officer Williams had information that the Defendant had, at a minimum, claimed he had a gun during the incident which prompted Mr. Wolever to call 9-1-1. Mr. Wolever identified the Defendant, who was standing on a second-floor breezeway outside his motel room, as the person whose behavior had prompted Mr. Wolever to call the authorities. Officer Williams asked the Defendant to come downstairs to talk, and the Defendant came down to the parking lot, was patted down for weapons, and answered questions about the earlier incident and about the gold Impala. The recording reflects that this interaction was brief, lasting about five minutes, and that it was focused on the investigation of the reported incident. Nothing in the recording suggests that Officer Williams or any other officer drew their weapons during the investigatory detention. The trial court found, "The defendant was properly briefly detained for an investigation of a threatening individual with a weapon based upon reasonable suspicion." The record supports the court's determination. Officer Williams had reasonable suspicion that the Defendant had been involved in an argument in which the Defendant had a gun. Officer Williams' initial investigation was brief and

focused on determining whether the Defendant was armed and whether a danger of a future threat involving a weapon existed. The Defendant is not entitled to relief on this basis.

### B. Search of the Car

The Defendant argues that the trial court erred in denying the motion to suppress the drug evidence obtained during the warrantless search of the Impala because he did not "unequivocally, specifically, intelligently" or "voluntarily" consent to the search. The State responds that the court properly denied the motion because the Defendant consented to the search. We agree with the State.

An exception to the warrant requirement exists for a search conducted pursuant to valid consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Consent for a warrantless search may be given by the defendant or by "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974); *see State v. Talley*, 307 S.W.3d 723, 734 (Tenn. 2010). Common authority is shown by mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched. *Matlock*, 415 U.S. at 172 n.7; *see Bartram*, 925 S.W.2d at 231. Consent must be "unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *State v. Simpson*, 968 S.W.2d 776, 784 (Tenn. 1998). A court must examine the totality of the circumstances in evaluating whether consent was voluntary or whether it resulted from duress or coercion. *State v. Cox*, 171 S.W.3d 174, 184 (Tenn. 2005).

The record reflects that during the brief investigatory detention, Officer Williams questioned the Defendant about the car, including if a weapon or "anything we need to worry about" was in the car. The Defendant said, "Nah." Officer Williams asked, "Do you mind if we check real quick?" and the Defendant responded, "Nah." A few seconds later, indiscernible yelling or arguing can be heard on the recording. On appeal, the Defendant argues that the Defendant's consent was not unequivocal and that "when [he] attempted to protest, one of the four officers silenced him." However, Officer Williams explained that another officer had to tell the Defendant to "stay seated" when the Defendant tried to follow Officer Williams to the car. The recording does not contradict Officer Williams' testimony. *See Echols*, 382 S.W.3d at 177. The Defendant also argues that Officer Williams requested consent to search the car during an unlawful detention. However, in section II.A. above, we rejected the Defendant's argument that the detention was unlawful. The Defendant also argues that Officer Williams wanted to search the car "to fish for evidence." However, a defendant's voluntary consent to a search is itself a

sufficient basis for the search to occur, and no additional showing of reasonable and articulable suspicion of criminal activity is required. *State v. Cox*, 171 S.W.3d 174, 181 (Tenn. 2005). The Defendant also alleges that he was "held against his will for unknown reasons, surrounded by uniformed officers." The record does not support these factual allegations. The trial court found that the Defendant consented to the search, and the record supports its determination. The Defendant is not entitled to relief on this basis.

### C. Securing the Motel Room

The Defendant argues that the trial court erred in denying the motion to suppress the evidence from his motel room because the officers, "with Mr. Wolever's assistance, fabricated a risk of danger to continue their unlawful investigation" in order to "gain access to the room." The State responds that the court did not err because the officers lawfully accompanied Mr. Wolever to the Defendant's room, at Mr. Wolever's request, in order for Mr. Wolever to secure the room as part of the process of evicting the Defendant from the motel. We agree with the State.

A motel guest has a reasonable expectation of privacy in his motel room. *Stoner v. California*, 376 U.S. 483, 490 (1964); *State v. Ross*, 49 S.W.3d 833, 840-41 (Tenn. 2001). This expectation of privacy does not extend, however, to the motel's common areas. *State v. Torsaunt Lamont Shanklin*, No. M2019-01896-CCA-R3-CD, 2021 WL 1082043, at *8 (Tenn. Crim. App. Mar. 22, 2021) (holding that a hotel guest had no reasonable expectation of privacy in the breezeway outside his hotel room), *perm. app. denied* (Tenn. May 15, 2021); *cf. State v. Talley*, 307 S.W.3d 723, 734 (Tenn. 2010) (holding that, upon consideration of the totality of the circumstances, a condominium owner did not have a reasonable expectation of privacy in a locked condominium building's common areas where any resident could provide an entry code to anyone of their choosing).

To the extent that the Defendant argues that the officers and Mr. Wolever concocted a concern of danger in order to access Defendant's motel room, he asks this court to reevaluate the credibility of the witnesses and to reweigh the evidence, matters which are reserved for the trial court as the trier of fact. *See Odom*, 928 S.W.2d at 23. The court found that the State's witnesses were credible, and their testimony shows that the officers did not enlist Mr. Wolever's cooperation in devising a pretextual reason for Mr. Wolever to open the motel room for the officers to see what was inside without first obtaining a warrant. *Cf. State v. Sanders*, 452 S.W.3d 300, 308 (Tenn. 2014) ("[T]he actions of a private person may be attributed to the government when the private person acts in concert with government authorities in pursuit of the same design or purpose."); *State v. Burroughs*, 925 S.W.2d 243, 246 (Tenn. 1996) (holding that the Fourth Amendment applies when a private citizen has formed the intent to assist a State actor but not when the private citizen acted for an independent reason). Mr. Wolever testified that he had been instructed by management to evict the Defendant if a second incident occurred. Mr.

Wolever said he called the police when the second incident occurred and told the officers he needed the Defendant to be removed from the property. Mr. Wolever said that guests signed a document which stated that they could be removed for possessing a firearm or for being involved in a physical disturbance. He said that the rental document listed the Defendant and Ms. Andrews as the motel guests. Officer Williams testified that Mr. Wolever related to him that the motel's management wanted the Defendant to be evicted and his room "cleared out" for the safety of employees and guests. Officer Medina testified that Mr. Wolever asked Officer Medina to accompany him to the Defendant's room "for safety reasons" while Mr. Wolever "began to shut that room down," which Officer Medina said involved emptying the room of any occupants. Officer Medina said he and the other officers did not ask Mr. Wolever to open the Defendant's room in order for the officers to "look around."

Having resolved the concern that the officers enlisted Mr. Wolever to open the door, we conclude that the Defendant had no reasonable expectation of privacy in the breezeway outside the room, from which location Officer Medina saw the black handgun inside the room. *See Torsaunt Lamont Shanklin*, 2021 WL 1082043, at *8; *see also Coolidge*, 403 U.S. at 465 (establishing the plain view doctrine as a limited exception to the warrant requirement). The trial court did not err in denying the motion to suppress, and the Defendant is not entitled to relief on this basis.

## III

## Admission of Evidence – Chain of Custody

The Defendant contends that the trial court erred in admitting the drug evidence without adequate proof of the chain of custody and in denying a motion for a mistrial after Agent Hamlett testified about the drugs' packaging. The State counters that the Defendant has waived consideration on the merits because he failed to object contemporaneously to the introduction of the evidence and did not request a mistrial. The State contends, as well, that plain error relief is not required. We conclude that the Defendant is not entitled to relief.

### A. Scope of Review

We begin with the State's argument that the Defendant waived any objection to the admission of the evidence by failing to make a contemporaneous objection, by failing to request a mistrial, and that he is limited to plain error review of these issues. The Defendant has not responded directly to the State's waiver argument but states that he "raised questions about the chain of custody . . . at the suppression hearing" and in the Motion to Reconsider. The record reflects the motions to suppress sought exclusion of the drug evidence on the basis of unconstitutional searches and seizures, not on the basis of the chain

-23-

of custody. Although defense counsel inquired at the suppression hearing about Officer Williams' and Investigator Jinks's procedures in securing the drug evidence, no issues in the nature of a motion in limine to exclude the evidence based upon the chain of custody were raised.

At the trial, defense counsel did not object to the admission of the drug evidence or test results at the time the officers and Agent Hamlett testified. However, defense counsel stated in her argument for a judgment of acquittal, "I would renew my chain of custody objection, which may not have come out clearly[.]" The trial judge stated that he had not understood any previous statement by counsel to be an objection to the chain of custody. Counsel stated, "Well, objection through the hearing and the motion to reconsider. So I would say that the chain of custody is broken and we cannot say for certain that what was presented was what was seized." The judge stated that no chain of custody issue had been raised in the motions to suppress or the motion to reconsider the motions to suppress and that no contemporaneous objection had been made to the drug evidence. However, the court found, "[T]here was a proper chain of custody laid out here." Defense counsel raised the issue the next day in a motion to reconsider the motion for judgment of acquittal, and the court reiterated its finding that the chain of custody had been sufficiently shown. The court stated that the evidence had already been admitted and that at this juncture in the proceedings, the remedy would be a mistrial. The defense did not request a mistrial at this point. Later, in the motion for a new trial, the defense alleged that the trial court erred in failing to grant a mistrial.

An objection to the introduction of evidence must be timely, and the specific basis for the objection must be stated unless it is apparent from the context. Tenn. R. Evid. 103(a)(1). "A trial court . . . generally has no duty to exclude evidence or to provide a limiting instruction to the jury in the absence of a timely objection." *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). Timely objections (1) permit the judge to rule on the admissibility of the evidence before it is introduced to the jury, (2) prevent sandbagging, whereby a lawyer holds back an objection but raises it on appeal if an unfavorable verdict is returned, and (3) provide the proponent of the evidence with the opportunity to offer the evidence by an alternative, nonobjectionable method. Neil P. Cohen, *et al.*, Tennessee Law of Evidence § 103[4][b] (6th ed.). In this vein, "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The moving party bears the burden of showing the necessity of a mistrial. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008). It follows, then, that the party who seeks the benefit of a mistrial must bring the matter to the court's attention in order to make the required showing. *See State v. Robinson*, 971 S.W.2d 30, 42-43 (Tenn. Crim .App. 1997) ("The defendant's failure to make a contemporaneous objection or motion for mistrial constitutes a waiver of the issue [regarding the denial of a mistrial, raised first in the motion for a new trial,] absent the existence of plain error."); *State v. Johnny L. Burns*, No. M2008-01374-

CCA-R3-CD, 2009 WL 2030425, at *4 (Tenn. Crim. App. July 13, 2009) (concluding that pursuant to *Robinson*, an issue regarding failure to grant a mistrial must be preserved by a contemporaneous objection or a contemporaneous motion for a mistrial but nevertheless reviewing the issue on the merits because the trial court did not deny the non-contemporaneous motion based upon waiver); *State v. Tracey Dion Payne*, No. M2000-02584-CCA-R3-CD, 2002 WL 1885062, at *7 n.5 (Tenn. Crim. App. Aug. 16, 2002) (concluding that *Robinson* "does not mandate that a complaining party make a contemporaneous motion for a mistrial in order to preserve an issue for appeal" and that an issue is preserved by "a contemporaneous objection to the objectionable behavior"); *cf. State v. Michael Maples*, No. E2009-00400-CCA-R3-CD, 2010 WL 2924203, at *4 (Tenn. Crim. App. July 27, 2010) (concluding without citing *Robinson* that the issue of the trial court's failure to grant a mistrial was waived because the defendant failed to object contemporaneously or make a contemporaneous request for a mistrial relative to a witness's testimony, despite the defendant's non-contemporaneous request for a mistrial during jury deliberations). Finally, we note that the Tennessee Rule of Appellate Procedure 36 provides, "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."

As the trial court aptly observed, the defense did not raise the chain of custody issue in the pretrial proceedings, nor did the defense object contemporaneously to the admission of the drug evidence and the drug testing evidence. The defense first raised the issue in the motion for judgment of acquittal, and the trial court considered the issue on its merits. To be clear, the appropriate and preferred practice is for a party to object contemporaneously to the admission of evidence at the time it is offered for admission. That said, if the court in the present case had agreed, once the defense belatedly raised the issue, that the chain of custody had not been shown, the court still had time to allow the State to reopen its proof to offer additional evidence regarding chain of custody, and the court could have stricken the evidence if the additional proof did not cure any chain-of-custody concerns. Thus, the issue was raised in time for the court to address it before the jury began deliberations and returned a verdict. We will consider the issue regarding the admissibility of the evidence on its merits.

However, the Defendant did not make a motion for a mistrial during the trial, even when the trial court suggested that a mistrial would be the appropriate remedy for the Defendant to pursue. We note that there cannot be a mistrial after the jury verdict has been accepted by the trial court. Because the Defendant did not make a timely motion for a mistrial, our review of the failure to grant a mistrial is limited to examination for plain error. *See* T.R.A.P. 36(a).

## B. Proof of Chain of Custody

Tennessee Rule of Evidence 901 states that evidence must be authenticated in order to be admissible. Evidence is authenticated by providing proof "sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). "[W]hen the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence," it should be admitted. *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008). In order to prove the reliability of tangible evidence, the State must prove "an unbroken chain of custody." *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000) (internal citation omitted). Relative to the State's burden in proving the chain of custody, our supreme court has stated the following:

> Even though each link in the chain of custody should be sufficiently established, this rule does not require that the identity of tangible evidence be proven beyond the possibility of all doubt; nor should the State be required to establish facts which exclude every possibility of tampering . . . . An item is not necessarily precluded from admission as evidence if the State fails to call all of the witnesses who handled the item . . . . [If] the State fails to offer sufficient proof of the chain of custody, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." *Scott*, 33 S.W.3d at 760 (quoting Cohen, et al., *Tennessee Law of Evidence* § 901.12, at 624 (3rd ed. 1995)).

*Cannon*, 254 S.W.3d at 296. This court reviews chain of custody determinations for an abuse of discretion. *Id*. at 295.

The evidence at the suppression hearing and the trial shows the following regarding the chain of custody of the drugs: Officer Williams found a baggie of crack cocaine when he searched the Impala. He placed the baggie in a drug envelope he obtained from his car, placed it in his car's trunk, and later gave the envelope to Investigator Jinks. Investigator Jinks testified that he and other officers executed the search warrant for the Defendant's motel room. He identified a small baggie of marijuana, two baggies of methamphetamine, and a baggie of crack cocaine discovered during the search, and they were received as exhibits. He said he followed KPD protocol in the present case, which required that suspected controlled substances be packaged in plastic and placed inside a paper drug envelope. Regarding the crack cocaine found in the car and in the room, he said he placed each baggie in a separate plastic bag, labeled the two exterior bags with "car" and "room" to identify the respective locations where they were found, and placed them in a single drug envelope, which he labeled with case-specific identifying information. He said he sealed the drug envelope with evidence tape and that it was transported to the TBI for testing. Agent Hamlett testified that the evidence was received by a TBI evidence technician and stored in the evidence vault until it was assigned to Agent Hamlett for analysis.

Investigator Jinks noted that the two substances identified as crack cocaine were labeled "car" and "room." Agent Hamlett performed the testing and resealed the evidence. Investigator Jinks said a KPD officer picked up the evidence after the testing. Investigator Jinks said the drug evidence remained sealed after testing until the morning of the trial, at which time he opened it in preparation for his testimony and resealed it until he was on the witness stand. Documents related to the collection and identification of evidence were received as an exhibit.

The Defendant raises several arguments quibbling with the precision of the identification and authentication of the evidence by Officer Williams, Investigator Jinks, and Agent Hamlett. The Defendant argues at length about the "car" and "room" labeling of the drugs and whether the State's witnesses testified consistently about when and on which bag these words were written. The law does not require that the chain of custody be shown "beyond the possibility of all doubt." *Scott*, 33 S.W.3d at 760. The State offered evidence of its of methods securing, identifying, safekeeping, and testing the evidence. The details of the "car" and "room" labeling of the drugs is of little significance, given the lack of proof suggesting that the evidence was fabricated, mixed with evidence from another case, or was not secure from tampering. The trial court did not abuse its discretion in concluding that the chain of custody was shown adequately and in admitting the drug evidence.

### C. Mistrial

Thus, we turn to the Defendant's allegation that the trial court erred in failing to grant a mistrial, notwithstanding defense counsel's failure to make a contemporaneous motion for a mistrial.

Five factors are relevant

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)); *see also State v. Minor*, 546 S.W.3d 59, 70 (Tenn. 2018). All five factors must exist in order for plain error to be recognized. *Smith*, 24 S.W.3d at 283. "[C]omplete consideration of all the factors is not necessary when it is

clear from the record that at least one of the factors cannot be established." *Id*. In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id*.; *Adkisson*, 899 S.W.2d at 642.

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

As we concluded above, the trial court did not abuse its discretion in admitting the drug evidence. Without an evidentiary error, no manifest necessity for a mistrial is apparent. The Defendant has failed to show the breach of a clear and unequivocal rule of law, that a substantial right afforded to him was adversely affected, and that we must consider the error in order to do substantial justice. *See id*.; *Smith*, 24 S.W.3d at 282. The Defendant has not shown that plain error exists.

The Defendant is not entitled to relief on this basis.

IV

**Sentencing**

The Defendant contends that the trial court erred in denying his request in his motion for a new trial for a sentencing reduction for his drug offenses based upon amendments to the Drug-Free Zone enhancement statute which occurred after the Defendant committed the offenses and after the trial and sentencing, but before the motion for a new trial was heard. The State responds that the court did not err in denying the sentencing reduction because the court lacked jurisdiction and authority to reduce the sentence. We agree with the State.

For each of the three drug convictions, the Defendant was sentenced pursuant to Code section 39-17-432, which at the time of the offenses and of sentencing, provided that for offenses committed within 1000′ of school property, the court shall impose a sentence one classification higher than otherwise prescribed by Code section 39-17-417 and that a defendant must serve at least the entire minimum sentence for his range, unreduced by sentence reduction credits. T.C.A. § 39-17-432(b)(1), (c) (2018) (subsequently amended). The trial court applied the sentencing classification enhancement required by the statute in

-28-

imposing the Defendant's sentences for the drug offenses. Before the motion for a new trial was heard, amendments to the statute became effective which made the sentence classification enhancement permissive and replaced the required service of at least the minimum sentence provision with a rebuttable presumption that a defendant would not be required to serve at least the minimum sentence unless the court made additional findings. *See id*. (Supp. 2020). The Criminal Savings Statute provides:

> When a penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, the offense, as defined by the statute or act being repealed or amended, committed while the statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense. Except as provided under § 40-35-117, in the event the subsequent act provides for a lesser penalty, any punishment imposed shall be in accordance with the subsequent act.

*Id.* § 39-11-112 (2018).

After the amendments to Code section 39-17-432 became effective, the Defendant amended his motion for a new trial to allege that he should be resentenced pursuant to the amendments because the "enhancement would no longer apply to [the drug] offenses." At the hearing, defense counsel stated that the Defendant sought resentencing because the amendments eliminated the minimum service requirement for the offenses. The trial court denied the request for resentencing on the basis that the Criminal Savings Statute "does not permit the application of amended or new statutes in cases where judgment has already been entered." The court also found that the Defendant's judgments were final because more than thirty days had passed since their entry.

Because the Defendant argues, in part, that the trial court erred in declining to apply the Criminal Savings Statute on the basis that the judgments were final when the Defendant raised the issue in the amended motion for a new trial, we begin there. To the extent that the Defendant argues that the judgments were not final, he is correct. "[A] trial court's order becomes final thirty days after its entry, unless a timely notice of appeal or appropriate post-trial motion is filed." *State v. Allen*, 593 S.W.3d 145, 154 (Tenn. 2020); *see* T.R.A.P. 4(a), (c). In the present case, the Defendant filed a timely motion for a new trial and later amended it to include the request for resentencing. The judgments were not final.

That said, our supreme court has held that the Criminal Savings Statute does not apply to a defendant who was sentenced before the effective date of an amendment to a criminal statute from which he seeks to benefit. *State v. Keese*, 591 S.W.3d 75, 81-84 (Tenn. 2019). The Defendant argues that cases involving favorable amendments to the theft grading statute, as were in question in *Keese*, are distinguishable from the Drug-Free

Zone statute on the basis that the former is "an integral part of the theft statute," whereas the latter "is an enhancement statute." We fail to see the distinction. In a theft case, the value of the property is not an element of theft but is relevant to determining the grade of the offense for purposes of sentencing. *State v. Jones*, 589 S.W.3d 747, 756 (Tenn. 2019). Likewise, the Drug-Free Zone statute affects enhancement of a drug conviction based upon the location where the offense occurred. Our supreme court has spoken: a defendant who has been sentenced is not entitled to the benefit of a subsequently amended, more favorable sentencing provision of a criminal statute. Like the Defendant in the present case, the *Keese* defendant was sentenced before the effective date of the favorable amendment and raised the issue in his motion for a new trial. *See id.* at 78.

In reaching this conclusion, we have considered the Defendant's policy argument that a denial of relief "will encourage delays [in litigation of pending cases] during legislative sessions if a favorable bill is slated for introduction." As an intermediate appellate court, we are bound by the precedent of our supreme court. *See, e.g.*, *Barger v. Brock*, 535 S.W.2d 337, 340 (Tenn. 1976); *State v. Pendergrass*, 795 S.W.2d 150, 155-56 (Tenn. Crim. App. 1989).

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE